**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| JAVIER YBARRA, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-09-0206 |
| | § | |
| RICK THALER, | § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

Petitioner, Javier Ybarra, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a

conviction in the 12th Judicial District Court of Madison County, Texas. Respondent filed a motion

for summary judgment, (Docket Entry No. 18), and copies of the state court record. Ybarra has filed

his response. (Docket Entry No. 21). After consideration of the motion and response, the record,

and applicable authorities, the court grants respondent's motion. The reasons for this ruling are

stated below.

## I.      Background

The two-count indictment charged Ybarra as follows:

> JAVIER YBARRA . . . on or about the 20th day of January, 2005, . . .
> did then and there
> COUNT I
> intentionally, knowingly, or recklessly cause bodily injury to Marcos
> Sepulveda by throwing an unknown hot liquid substance on the said
> Marcos Sepulveda, and the defendant did then and there know that
> the said Marcos Sepulveda was then and there a public servant, to-
> wit: a Sergeant employed by the Texas Department of Criminal
> Justice, and that the said Marcos Sepulveda was then and there
> lawfully discharging an official duty, to-wit: supervising inmates,
>
> COUNT II

> intentionally, knowingly, or recklessly cause bodily injury to Zenita
> Hamilton by throwing an unknown hot liquid substance on the said
> Zenita Hamilton, and the defendant did then and there know that the
> said Zenita Hamilton was then and there a public servant, to-wit: a
> correctional officer employed by the Texas Department of Criminal
> Justice, and that the said Zenita Hamilton was then and there lawfully
> discharging an official duty, to-wit: supervising inmates, . . .

*Ex parte Ybarra,* Application No. 40,070-06 at 18.

A jury found Ybarra guilty of both counts of the felony offense of assault on a public servant. (Cause Number 05-10942-012-03). At the time this sentence was imposed, Ybarra was serving a life sentence for attempted capital murder in Cause Number 96-CR-1454-C.[1] On January 24, 2007, the court sentenced Ybarra to two five-year prison terms to be served consecutively to his life sentence in 96-CR-1454-C. The Tenth Court of Appeals of Texas affirmed Ybarra's conviction on January 2, 2008. *Ybarra v. State,* No. 10-07-00066-CR, 2008 WL 43620 (Tex. App. - Waco, 2008, pet. ref'd)(not designated for publication). The Texas Court of Criminal Appeals refused Ybarra's petition for discretionary review on May 21, 2008. Ybarra filed an application for state habeas corpus relief on August 18, 2008, which the Texas Court of Criminal Appeals denied without written order on October 1, 2008. *Ex parte Ybarra,* Application No. 40,070-06 at cover.

This court received Ybarra's federal petition on November 25, 2008. Ybarra attacks the validity of his conviction on the following grounds:

(1)    The trial court failed to instruct the jury on self-defense;

(2)    The trial court refused to substitute trial counsel, Kenneth Nash, with a new attorney;

---

[1]This sentence was imposed by the 197th Judicial District Court of Cameron County, Texas on February 19, 1997. (Reporter's Record, Vol. IV, Supplemental Exhibit Volume, Penitentiary Packet, P-1).

(3)     Nash rendered ineffective assistance by refusing to submit certain defense motions on

Ybarra's behalf;

(4)     All of the individuals selected to serve on the jury were white;

(5)     Ybarra was placed in shackles before the jury; and

(6)     Prison officials used excessive amounts of pepper gas, in violation of the Eighth Amendment.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 8-13).

## II.     The Applicable Legal Standards

This court reviews Ybarra's petition for writ of habeas corpus under the federal habeas

statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28

U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d

409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).

Sections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact,

questions of law, and mixed questions of fact and law that result in an adjudication on the merits.

An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case

is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).  A

state-court determination of questions of law and mixed questions of law and fact is reviewed under

28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an

unreasonable application of clearly established Federal law, as determined by the Supreme Court of

the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is

"contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached

by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are

materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite

result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under section 2254(e)(1) unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman,* 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke,* 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)).  This deference extends not only to express findings of fact, but to the implicit findings of the state court as well.  *Garcia,* 454 F.3d at 444-45 (citing *Summers v. Dretke,* 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules.  Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party.  Unless the petitioner can "rebut[ ] the presumption of correctness by clear

and convincing evidence" as to the state court's findings of fact, those findings must be accepted as

correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Ybarra is proceeding *pro se*. A *pro se* habeas petition is construed liberally and not held to

the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98

F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall*

*v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981).  This court broadly interprets Ybarra's state

and federal habeas petitions. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## III.    Statement of Facts

At trial, the State called the two prison guards who were assaulted by Ybarra and the nurse

that treated them.

Zenita Hamilton testified that she worked as a correctional officer at the Ferguson Unit from

approximately July 5, 2001 to December 1, 2006.  Her duties required her to watch over the

offenders, to make sure that they complied with all written procedures, to make sure they did not

leave the premises at any time without prior approval, and to provide public safety.  On January 20,

2005, she was working in the hallway as an escort officer and supervising inmates.  She saw Ybarra

on E-block, two-row, one-cell.  She was the video operator for the use of force that was being

conducted on him. (Reporter's Record, Vol. II, p. 108).  The use of force consisted of applying hand

restraints and removing him from the cell.  Sergeant Sepulveda was supervising the use of force.

Officer Hamilton explained that a five-man team is used to extract the inmate from his cell.  Each

of the five officers was given riot equipment, consisting of a helmet, a vest, a shield, knee guards,

and elbow guards.  If the inmate refused to come out of the cell, each man would have a particular

job to do.  If the inmate complied with the order, two of the officers would escort him to the new

cell.  When Officer Hamilton arrived at E-block, she saw Sergeant Sepulveda engaging in verbal intervention, which meant that he was explaining the consequences of the inmate's refusal to comply with orders.  Sergeant Sepulveda told Ybarra that he had to submit to a strip search, submit to hand restraints, and come out of the cell.  If he did not comply, chemical agents would be utilized.  At the time, Ybarra was in the cell, and Sergeant Sepulveda was standing in front of the cell, behind a shield that was used to protect the officer from the inmate.  Officer Hamilton was standing on the landing directly across from the cell.  (*Id*. at 115).  Ybarra refused the order to submit to a strip search.  Sergeant Sepulveda again instructed Ybarra that chemical agents would be used if he did not comply with the orders.  Sergeant Sepulveda administered one burst of chemical agent. Immediately after the first burst of chemical agent, Ybarra threw a hot liquid substance toward Sergeant Sepulveda and Officer Hamilton.  The scalding hot, unidentified liquid fell on Officer Hamilton's right hand, and on her lower arm area between her wrist and her elbow.  She had redness, tenderness, and blistering.  She continued to videotape the use of force.  After the burst was administered, Ybarra complied with the orders.  He was strip searched, handcuffed, and moved to a different cell block.  Officer Hamilton then went to the infirmary to seek medical treatment. Officer Hamilton took Polaroid photographs, State's Exhibits 5 and 6, which showed the places on Sergeant Sepulveda's body where he was struck by the liquid.  Sergeant Sepulveda suffered injuries to his scalp, the front of his neck, and on one of his wrists.  (*Id*. at 119).  At the time Sergeant Sepulveda administered the chemical agent, he was wearing a standard gas mask issued by the Texas Department of Criminal Justice.  Officer Hamilton was also wearing a mask.  Officer Hamilton videotaped the incident using a standard digital video camera.  (*Id*. at 121).  Officer Hamilton explained that there was a skip on the videotape because the video camera started to malfunction

after the liquid substance was thrown out of the cell. She replaced the battery, and the camera began to function properly. Officer Hamilton testified that State's Exhibit 9 was an accurate reflection of events on January 20, 2005. (*Id.* at 124).

The videotape shows each of the five-man extraction team identifying themselves. Sergeant Sepulveda gave three separate orders for Ybarra to submit to a strip search and physical restraints. Ybarra refused the orders. Immediately after Sergeant Sepulveda sprayed the chemical agent, a gray liquid was thrown in the direction of the officers who were standing outside Ybarra's cell. The officers voiced their surprise on being struck by the liquid. There was a brief pause in the filming because the camera was damaged by the water. Ybarra submitted to a strip search while still in the cell. Ybarra put his wrists through the food slot in the cell door, and an officer applied hand restraints. The videotape shows Ybarra being moved to the new cell. Ybarra threatened to kill the officers. Ybarra was given the opportunity to write a statement concerning the use of force incident. A nurse visually examined Ybarra and photographs were taken of Ybarra from different angles. (Reporter's Record, Vol. IV, State's Exhibit 9).

On cross-examination of Officer Hamilton, Ybarra tried to establish that he could not see Officer Hamilton, that he did not intentionally throw any liquid on her; and that he had no animosity toward Officer Hamilton.

Mary Beth Pipkin testified that she was a registered nurse at the Ferguson Unit. (Reporter's Record, Vol. II, pp. 128-29). On January 20, 2005, she was working at the Ferguson Unit as a staff nurse in the clinic. She saw Zenita Hamilton in the clinic after she was struck with a hot liquid. (*Id.* at 130). Nurse Pipkin did not know whether the liquid was water. Nurse Pipkin testified that Officer Hamilton was struck by the liquid on her right arm and hand. The degree of burn is determined by

7

the layer of skin that is affected.  Nurse Pipkin determined that Officer Hamilton sustained first-degree burns.  Officer Hamilton reported that the injury was stinging and that it hurt.  (*Id.* at 132).

Nurse Pipkin also treated Sergeant Sepulveda, who sustained burns on his scalp, face, neck, and his arm.  (*Id.* at 133).  He had second-degree burns on his neck and on his right wrist.  (*Id.*).  Nurse Pipkin was concerned about the potential for infection and tried to get those areas cleaned.  She applied medications to decrease the severity of the burn and put a barrier on it to decrease the chances of infection.

On cross-examination, Ybarra asked if the liquid was clear and whether she saw any residue.

Marcos A. Sepulveda testified that he was a Lieutenant of Correction Officers at the Ferguson Unit. (Reporter's Record, Vol. II, p. 136).  He was previously a sergeant of correctional officers for three years.  As a sergeant in January of 2005, he had a supervisory position.  He was responsible for assigning the officers on his shift and maintaining security of the inmates.  (*Id.* at 137).  On January 20, 2005, Sergeant Sepulveda was supervising correctional officers in administrative segregation.  Sergeant Sepulveda explained that the correctional officers supervised the inmates, and Sergeant Sepulveda, in turn, supervised the correctional officers.

Sergeant Sepulveda went to Ybarra's cell to move him.  Sergeant Sepulveda, as part of his verbal intervention, ordered Ybarra to perform a strip search and submit to hand restraint so he could be moved to P-block.  (*Id.* at 139).  When Ybarra did not comply, Sergeant Sepulveda told him there would be consequences to his actions.  Sergeant Sepulveda told Ybarra he was going to get authorization to use chemical agents and a five-man forced cell move team.  Because Ybarra did not comply, Sergeant Sepulveda sought authorization to use chemical agents.  (*Id.* at 140).  Sergeant Sepulveda explained that because the chemical agent was made from Habanera peppers, it burned

the mucous membranes, affected the ability to breathe, and prevented the person being sprayed from opening their eyes. Sergeant Sepulveda used the chemical agent to force Ybarra to comply with orders.

Once Sergeant Sepulveda administered the burst, he saw Ybarra rush toward the front of the cell. Sergeant Sepulveda saw something in Ybarra's hand. Sergeant Sepulveda did not administer a second burst because Ybarra threw a hot liquid on Sergeant Sepulveda. (*Id.* at 142). The liquid struck Sergeant Sepulveda on the face, neck, wrist, and upper body. His uniform was covered with the liquid. Sergeant Sepulveda waited approximately five minutes for the chemical agent to take effect and then ordered Ybarra to exit the cell. (*Id.* at 144). After securing Ybarra in P-block, Sergeant Sepulveda went to the infirmary where Nurse Pipkin applied a solution to ease the burning. (*Id.* at 145).

At the time he was struck by the liquid, he was wearing a TDC uniform. Sergeant Sepulveda testified that a few hours earlier Officer David Cole had reported being threatened by Ybarra. Sergeant Sepulveda decided to move Ybarra based on Officer Cole's information. The use of force incident began at 3:00 a.m. Sergeant Sepulveda testified that David Cole was not involved in the use of force against Ybarra.

On cross-examination, Ybarra asked when Sergeant Sepulveda came on to the wing; whether Sergeant Sepulveda attempted to resolve the matter informally, according to TDCJ policy; whether he saw an antenna protruding from Ybarra's cell; whether he and Sergeant Sepulveda laughed about removing the antenna from Ybarra's cell; whether he assumed that the officer's account of events was true; whether he used two canisters of pepper gas; whether he had contact with Ybarra at 12:00; and whether he could see Ybarra in his cell.

Acting *pro se*, Ybarra first called Officer Hamilton to testify for the defense. Officer Hamilton testified that she was standing in front of Ybarra's cell. She said she believed Ybarra intended to throw water on her because he threw it out of the cell.

Ybarra called Sergeant Sepulveda. Sergeant Sepulveda testified that he did his roster count at approximately midnight, but did not recall seeing the coaxial cable. Sergeant Sepulveda could not recall the time at which Officer Cole told him about Ybarra's threat. On cross-examination, Sergeant Sepulveda testified that Ybarra threatened Officer Cole by saying, "Your ass is mine, bitch." Based on this threat, Sergeant Sepulveda determined it was necessary to move Ybarra from the cell block.

Officer David Howard Cole testified that he did not know why Ybarra threatened Officer Cole. Officer Cole testified that he did not recall grabbing Ybarra's coaxial cable and breaking his radio. He did show Sergeant Sepulveda the coaxial cable seized from Ybarra. (Reporter's Record, Vol. III, p. 24). He recalled that Ybarra's coaxial cable was protruding from Ybarra's cell for several feet. He reported the threat shortly after Ybarra made the threat. Officer Cole denied any recollection of urinating in Ybarra's coffee. Officer Cole testified that he remembered that Ybarra had a homemade paper pole with an antenna on it. He recalled ordering Ybarra three times to pull it into his cell.

On cross-examination, the prosecutor established that Officer Cole worked at the Ferguson Unit; that he was wearing a gray TDCJ uniform; that he was involved in the use of force incident; that he saw Sergeant Sepulveda in the infirmary with injuries; that Officer Cole confiscated Ybarra's antenna; and that Ybarra threatened Officer Cole. Officer Cole testified that he put a shield in front of Ybarra's cell because, "I was afraid that he was going to throw something on a correctional officer since he was -- he went to the back of his cell and started concocting, or he was up to no good, I

could tell from my experience of persons that he was so angry he went to the back of the cell and began heating something up and getting his hot pot ready. That's when I pulled the shield in front of his cell." (Reporter's Record, Vol. III, pp. 35-36).

## IV.    The Claim Based on Trial Court Error

Ybarra complains that the trial court failed to instruct the jury on self-defense. Ybarra states that he acted in self-defense. He states that he was responding to Sergeant Sepulveda's use of two canisters of pepper gas. Ybarra states that he defended himself against an unlawful use of force.

Improper jury instructions in state criminal trials rarely form the basis for federal habeas relief. *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). "In examining habeas claims of improper jury instructions, the inquiry is not whether there was prejudice to the petitioner, or whether state law was violated, but whether there was prejudice of constitutional magnitude." *Galvan*, 293 F.3d at 764 (internal citation omitted). Rather, "the relevant inquiry is whether the failure to give an instruction 'by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 764-65 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Moreover, "there is a strong presumption that errors in jury instructions are subject to harmless-error analysis." *Id.* Additionally, on habeas review, a federal court is barred from reviewing a state court decision that rests upon adequate and independent state grounds. *Dretke v. Haley*, 541 U.S. 386 (2004). When reviewing jury instructions in federal habeas, "[t]he only question ... is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Hughes v. Johnson*, 191 F.3d 607, 627 (5th Cir. 1999) (quoting *Estelle v. McGuire*, 502 U.S. 62 (1991)).

A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence. TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). If evidence, from

any source, raises a defensive theory, it must be included in the court's charge. *Ferrel v. State,* 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Taylor v. State,* 856 S.W.2d 459, 470-71 (Tex. App.-Houston [1st Dist.] 1993), *aff'd,* 885 S.W.2d 154 (Tex. Crim. App. 1994). A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, regardless of whether that evidence is strong, weak, unimpeached, or contradicted and regardless of what the trial court may think about the credibility of the defense. *Ferrel,* 55 S.W.3d at 591; *Walters v. State,* 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). However, if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue. *Ferrel,* 55 S.W.3d at 591. Self-defense is shown when a person is justified in using force against another when the actor reasonably believes the force is necessary to protect oneself against another's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2009). The use of force is not justified in response to verbal provocation alone. TEX. PENAL CODE ANN. § 9.31(b)(1) (Vernon Supp. 2009).

If the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue. *Id.* To be entitled to an instruction on self-defense, an accused first must raise the issue of self-defense by admitting the conduct charged in the indictment and then offer self-defense evidence as justification for that conduct. *Jackson v. State,* 110 S.W.3d 626, 631 (Tex. App. - Houston [14th Dist.] 2003, pet. ref'd).

The record shows that standby counsel requested a jury instruction on self-defense. (Reporter's Record, Vol. III, pp. 44-45). At trial, the prosecutor responded that Ybarra was not entitled to a self-defense instruction because Ybarra did not essentially admit the elements of the offense. (*Id.* at 45); *see Shaw v. State,* 243 S.W.3d 647, 659 (Tex. Crim. App. 2007), *cert. denied,* ---

U.S. ----, 128 S. Ct. 2486 (2008) (holding defensive instruction only appropriate when defendant essentially admits to every element of the offense including the culpable mental state, but imposes justification to excuse the otherwise criminal conduct).   The standard is whether a defendant "essentially admits" the elements of an offense, but this court concludes there was no such admission.

Ybarra was charged with assaulting two correctional officers while they were discharging their official duties in the prison.   Ybarra has not pointed to any testimony showing that he essentially admitted the charged conduct.  Ybarra acted *pro se* and questioned the State's witnesses concerning the events leading to the use of force.  Through his questioning, Ybarra tried to show that Ybarra was acting in self-defense when he threw the hot liquid on Sergeant Sepulveda, who was administering the chemical agent.  He never testified and admitted to the elements of the offense. Ybarra fails to show that self-defense applied in his case or that he was entitled to a jury instruction on that issue, as he claims.  Based on its independent review of the trial record, this Court concludes that a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt.  Because Ybarra fails to show that his conviction was supported by insufficient evidence in violation of the *Jackson v. Virginia* standard, he is not entitled to relief on this issue. Because the evidence at trial did not raise the issue of self-defense, the trial court did not err by refusing Ybarra's request for a jury instruction on the matter.

Ybarra raised this issue on appeal, and that court rejected the claim, stating:

> In one issue, Ybarra contends that the trial court erred in denying his requested self defense instruction. In general, "a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." TEX. PENAL CODE

ANN. § 9.31(a) (Vernon 2003). Further, a "defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence...." *Young v. State,* 991 S.W.2d 835, 840 (Tex. Crim. App. 1999) (Mansfield, J., dissenting). However, if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue. *Ferrel v. State,* 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). Additionally, "to rely on 'self-defense,' the defendant must first admit," or "substantially admit," "committing the conduct which forms the basis of the indictment; the defense is inconsistent with a denial of the conduct." *East v. State,* 76 S.W.3d 736, 738 (Tex. App. - Waco 2002, no pet.); *see Ex parte Nailor,* 149 S.W.3d 125, 133-34 (Tex. Crim. App. 2004) (distinguishing self defense from accident); *see also Kitchen v. State,* No. 10-05-00169-CR, 2006 WL 949882 (Tex. App. - Waco April 12, 2006, pet. ref'd).

Although he conducted cross-examination and direct-examination, Ybarra was not sworn as a witness and did not testify. What was established through the witnesses who testified was that Ybarra threatened an officer; he was asked to submit to a strip search and be moved to another location; he refused; a use of force team was established; he again refused to submit to a strip search and be moved; he was sprayed with a chemical agent; he threw a very hot liquid substance at the officers; the liquid struck two officers which burned them. Self defense was not established by the evidence and, accordingly, Ybarra was not entitled to the self-defense instruction. Ybarra's sole issue is overruled.

Having overruled Ybarra's only issue, the trial court's judgment is affirmed.

*Ybarra v. State,* No. 10-07-00066-CR, 2008 WL 43620, *1 (Tex. App. - Waco, 2008, pet. ref'd)(not designated for publication).

In Texas, "a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). As noted by the appellate court, Ybarra never took the stand on his own behalf and he never testified that he was in fear or that he reasonably believed that his conduct was immediately necessary to protect himself. Ybarra's

allegations, and testimony of the State's witnesses, do not demonstrate that self-defense was justified under the circumstances.

Because Ybarra fails to demonstrate that he had any viable claim of self-defense, he fails to show that he was entitled to a jury instruction on that issue. Absent a showing that Ybarra was entitled to a jury instruction on this defense, he cannot show that the trial court erred. To be entitled to federal habeas corpus relief on an improper jury instruction claim, a habeas petitioner must establish that the erroneous instruction was so prejudicial that it negatively affected the outcome of the trial. *Tarpley v. Estelle*, 703 F.2d 157, 159 (5th Cir.), *cert. denied*, 464 U.S. 1002 (1983).

The Texas Court of Appeals' rejection of Ybarra's jury charge claim is not contrary to or an unreasonable application of clearly established Federal law, nor is it based on an unreasonable determination of the facts in light of the evidence. In federal habeas proceedings, federal courts are not to review a state's interpretation of its own law. This includes a state's interpretation of its law(s) governing defenses to criminal charges and the applicable jury instructions relative thereto. Here, a review of the record supports the conclusion of the trial court and Texas Court of Appeals that the evidence did not support Ybarra's claim of self-defense. In the absence of some evidence to support Ybarra's claim of self-defense under section 9.31(a) of the Texas Penal Code, it was not error to refuse a self-defense instruction.

Ybarra is not entitled to federal habeas corpus relief on this claim.

## V.    The Claim Based on the Denial of Substitute Counsel

Ybarra states that he asked the trial court to dismiss Nash because Nash had a conflict of interest. Ybarra explains that Nash was employed as State Counsel for Offenders, and he was forced to represent Ybarra in a criminal case involving TDCJ officers. (Docket Entry No. 21, Petitioner's

Response, p. 3).  Ybarra claims he had shown good cause and was entitled to a substitution of counsel.

"Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest." *United States v. Vaquero,* 997 F.2d 78, 89 (5th Cir. 1993).  A petitioner has the burden of showing that an actual conflict of interest adversely affected counsel's performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348-50 (1980); *United States v. Villareal,* 324 F.3d 319, 327 (5th Cir. 2003).  "An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty to loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo v. Johnson,* 205 F.3d 775, 781 (5th Cir. 2000).  However, "[t]he mere possibility of a conflict, absent some showing that the attorney actively represented conflicting interests, is not sufficient." *Cuyler,* 446 U.S. at 348.  "To prevail, a defendant must identify 'some plausible defensive strategy or tactic [that] might have been pursued but was not, because of the conflict of interest.'" *Hernandez v. Johnson,* 108 F.3d 554, 560 (5th Cir. 1997) (quoting *Perillo v. Johnson,* 79 F.3d 441, 449 (5th Cir. 1996)).

It is well settled that the granting of a motion to discharge defense counsel is within the sound discretion of the trial judge.  A Sixth Amendment violation occurs only if a court refuses to inquire into a seemingly substantial complaint about defense counsel; otherwise, the trial judge has broad discretion to decide whether to grant a request for the substitution of counsel, since the right to counsel cannot be manipulated to interfere with the orderly procedures of the court or the fair administration of justice. *See Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993).  Moreover, while a criminal defendant has an absolute right to be represented by retained counsel of his choosing, and

must be informed of such right by the Court, if the defendant is indigent and unable to retain private

counsel, a lawyer will be appointed by the Court.   An indigent defendant is not entitled to have a

particular lawyer represent him, or to demand a different appointed lawyer except for good cause.

*See Morris v. Slappy*, 461 U.S. 1 (1983).   The Sixth Amendment right to counsel "comprehends a

qualified right to select and be represented by counsel of choice," belonging solely to criminal

defendants possessing sufficient assets to retain such counsel. *See United States v. Bissell*, 866 F.2d

1343, 1351 (11th Cir. 1989).   The Fifth Circuit explained:

> In order to warrant a substitution of counsel during trial, the
> defendant must show good cause, such as a conflict of interest, a
> complete breakdown in communication or an irreconcilable conflict
> which leads to an apparently unjust verdict. If a court refuses to
> inquire into a seemingly substantial complaint about counsel when he
> has no reason to suspect the bona fides of the defendant, or if on
> discovering justifiable dissatisfaction a court refuses to replace the
> attorney, the defendant may then properly claim denial of his Sixth
> Amendment right. In the absence of a conflict which presents such a
> Sixth Amendment problem, the trial court has discretion to decide
> whether to grant a continuance during the course of trial for the
> substitution of counsel, and that decision will be reversed only if the
> court has abused its discretion.

*United States v. Young*, 482 F.2d 993 (5th Cir. 1973)(quoting *United States v. Calabro*, 467 F.2d

973, 986 (2d Cir. 1972))(citations omitted).

A court violates the Sixth Amendment if it allows a defendant to represent himself without

first obtaining a valid waiver of counsel. *See, e.g., United States v. Medina*, 161 F.3d 867, 870 (5th

Cir. 1998).   A defendant cannot be forced to choose between conflicted counsel and no counsel at

all, and any waiver of counsel that results from those circumstances is not valid. *See Dunn v.

Johnson*, 162 F.3d 302, 307 (5th Cir. 1998).   However, indigent defendants have no right to

appointed counsel of their choice. *See, e.g., United States v. Breeland*, 53 F.3d 100, 106 n.11 (5th

Cir. 1995). Rather, "[a] defendant's refusal without good cause to proceed with able appointed counsel constitutes a voluntary waiver of that right." *Richardson v. Lucas*, 741 F.2d 753, 757 (5th Cir. 1984). "The question [of voluntariness] therefore boils down to whether [Ybarra] demonstrated good cause for the substitution of assigned counsel." *United States v. Fields*, 483 F.3d 313, 350 (5th Cir. 2007)(quoting *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981)). A defendant is only entitled to substitute counsel if the court finds significant interference with an existing attorney's "ability to provide zealous representation." *Fields*, 313 F.3d at 350 (citing *United States v. Boone*, 437 F.3d 829, 839 (8th Cir.), *cert. denied*, 549 U.S. 870 (2006)).

The Fifth Circuit noted the importance of counsel's perception of a conflict. District courts reasonably may rely on defense counsel's assessment regarding the potential for conflict. *See Holloway v. Arkansas*, 435 U.S. 475, 485 (1978)(stating that the appointed attorney "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial"). *United States v. Creel*, 158 Fed. Appx. 627, 628 (5th Cir. 2004) (unpublished) (defendant's "disagreements with counsel" did not "constitute[ ] good cause for him to receive a new attorney").

Prior to trial, the court conducted a hearing to determine whether Ybarra was entitled to the substitution of court-appointed counsel. Kenneth Nash testified that he was an employee of the Texas Department of Criminal Justice State Counsel for Offenders. Nash was appointed on August 23, 2005 and on September 15, 2005 he reviewed the prosecutor's file. Nash expressed his willingness to help Ybarra. Nash testified that he had been working on the case for more than six months.

Nash explained that the genesis of this case was over a broken radio. Nash explained that Ybarra had a dispute with Officer Cole concerning the coaxial cable at midnight on January 20, 2005. Officer Cole pulled on the cable and broke the radio. Ybarra threatened Officer Cole, and Officer Cole charged Ybarra with threatening an officer. This precipitated the cell move. Sergeant Sepulveda used pepper gas to extract Ybarra at 3:00 a.m.

Nash believed that Officer Cole pulled on Ybarra's cable, caused the radio to fall, and broke the radio. Nash explained that he did not think Ybarra could assert the defensive theory of self-defense. Specifically, Nash did not think Ybarra could rely on the provocation by Officer Cole to justify his actions against Sergeant Sepulveda and Officer Hamilton. Nash believed that in the event Ybarra was convicted, Ybarra could offer the evidence concerning Officer Cole's conduct as mitigating evidence. (*Id.* at 23). Nash sought to present the testimony of Officer Cole to show Ybarra's state of mind at the time of the assault.

Ybarra complained that he could no longer work with Nash because Nash had refused to call Officer Cole as a witness. Ybarra complains that his attorney, Nash, had a conflict of interest because he worked for State Counsel for Offenders, a division of TDCJ. "A court-appointed attorney's responsibility is to the criminal defendant he represents, not to the individual or agency that pays for his services." *Damian v. State,* 807 S.W.2d 407, 408 (Tex. App. - Houston [14th Dist.] 1991, pet. ref'd). Moreover, a conflict of interest is not inherently present simply because a defendant is represented in a criminal prosecution by an attorney receiving payment from the State for his services. *Id.; see also, Ferguson v. State,* No. 01-03-01313-CR, 2005 WL 913140 (Tex. App. - Houston [1 Dist.] 2005). Ybarra points to no evidence, and the court finds none in the record, that his appointed trial counsel failed in the responsibilities owed to Ybarra or that his counsel was

otherwise burdened by an actual conflict of interest.    Ybarra fails to meet his burden of demonstrating an actual conflict existed so as to establish a violation of his Sixth Amendment rights.

Under the circumstances, Nash did not labor under a conflict of interest substantial enough to significantly threaten his ability to provide Ybarra with effective representation. That being so, Ybarra's waiver of counsel was voluntary.

Ybarra has not shown that his disagreements with counsel constituted good cause for him to receive a new attorney. *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973). Consequently, Ybarra likewise has not shown that the district court erred in denying his request for substitute appointed counsel. Furthermore, Ybarra has failed to show how any conflict of interest prejudiced him.

Ybarra may argue that his waiver of assistance of counsel was not knowingly or intelligently given; therefore, his self-representation violated the Sixth Amendment. Ybarra states that he waived "his right to be represented by Nash, not by a substitute counsel who would mount a meaningful defense." (Docket Entry No. 21, Petitioner's Response, p. 6).

The Sixth Amendment grants defendants the constitutional right to represent themselves in federal court. *Faretta v. California*, 422 U.S. 806, 812-21 (1975).  For a defendant to exercise his right to self-representation, he must "'knowingly and intelligently' forego counsel, and the request to proceed *pro se* must be 'clear and unequivocal.'" *United States v. Martin*, 790 F.2d 1215, 1218 (5th Cir.), *cert. denied*, 479 U.S. 868 (1968) (citations omitted). The assertion of this right proceeds in two steps: first, the defendant must unequivocally inform the court of his desire to represent himself; and, second, "the court must conduct a *Faretta* hearing to determine whether the defendant is 'knowingly and intelligently' forgoing his right to appointed counsel and whether, by

post-invocation action, he has waived the request [to proceed *pro se* ]." *United States v. Cano*, 519 F.3d 512, 516 (5th Cir. 2008). "Where a fundamental constitutional right, such as the right to counsel, is concerned, courts indulge every reasonable presumption against waiver." *Burton v. Collins*, 937 F.2d 131, 133 (5th Cir. 1991), *cert. denied*, 502 U.S. 1006 (1991). When a defendant, unskilled in the law, does not make a clear election to forego counsel, a court should not infer that the defendant has opted to take his own defense. *Id.*

According to the record, Ybarra informed the court of his desire to represent himself, (Reporter's Record, Vol. II, p. 5), thereby satisfying the first step of this process. Ybarra expressed a clear desire to represent himself. His statements at the hearing revealed that he wished to subpoena Officer Cole, but that his attorney would not do so for strategic reasons. Ybarra thus wished to have a court-appointed attorney - but one who would completely defer to him on all matters of strategy. Attorneys cannot, however, perform their duties adequately under such limitations. The court explained the benefits of having appointed counsel and the pitfalls of proceeding without counsel, and Ybarra requested to proceed *pro se.*

"In order to determine whether the right to counsel has been effectively waived, the proper inquiry is to evaluate the circumstances of each case as well as the background of the defendant." *Wiggins v. Procunier*, 753 F.2d 1318, 1320 (5th Cir. 1985). In *Martin*, the Fifth Circuit articulated a list of factors to be considered in determining whether a defendant's motion has been "knowingly and intelligently" made:

> The Court must consider the defendant's age and education, and other
> background, experience, and conduct. The Court must ensure that the
> waiver is not the result of coercion or mistreatment of the defendant,
> and must be satisfied that the accused understands the nature of the

> charges, the consequences of the proceedings, and the practical
> meaning of the right he is waiving.

*Martin*, 790 F.2d at 1218 (citations omitted).  Applying these factors, no doubt exists as to whether

Ybarra's waiver was knowingly, voluntarily, and intelligently made.

In a collateral attack on a conviction defended *pro se*, the defendant has the burden to prove

that he did not competently or intelligently waive his right to the assistance of counsel. *Iowa v.*

*Tovar*, 541 U.S. 77, 92 (2004).  The record establishes that Ybarra was informed of his right to

counsel and warned of the risks of representing himself.  The court repeatedly expressed his

confidence in Nash's ability to represent Ybarra effectively.  The court questioned Ybarra regarding

his background, education, and experience.  The court also had ample opportunity to observe

Ybarra.  Based on the reasons stated above, the court is satisfied that Ybarra understood his rights,

and that the trial court committed no error by allowing him to proceed *pro se* with appointed counsel

acting in a standby capacity.

Ybarra is not entitled to federal habeas corpus relief on this claim.

**VI.     The Claim of Ineffective Assistance of Standby Counsel**

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his

counsel's actions fell below an objective standard of reasonableness and petitioner suffered prejudice

as a result. *Strickland v. Washington,* 466 U.S. 668 (1984); *Martin v. Cain,* 246 F.3d 471, 477 (5th

Cir. 2001).  The district court may dispose of a claim if counsel either rendered reasonably effective

assistance or no prejudice can be shown.  A court evaluating a claim of ineffective assistance need

not address the reasonableness component first.  If a petitioner fails to make one of the required

showings, the court need not address the other.   *Strickland,* 466 U.S. at 697.

In assessing the reasonableness of counsel's performance, the court must indulge a strong presumption that the performance falls within the "wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689; *Gray v. Lynn,* 6 F.3d 265, 268 (5th Cir. 1993). If counsel's action is based on well-informed strategic decisions, it is "well within the range of practical choices not to be second-guessed." *Rector v. Johnson,* 120 F.3d 551, 564 (1997)(quoting *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993)).

As to the prejudice portion of the inquiry, a convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. An attorney's strategic choices based on information supplied by the defendant and gathered from an investigation of the relevant law and facts "are virtually unchallengeable." *Id.* at 691.

Ybarra asserts that his standby counsel rendered ineffective assistance by failing to file certain motions. Ybarra does not, however, identify the motion. It appears that Ybarra complains that counsel failed to subpoena Officer Cole.

In *Faretta*, the Supreme Court held that a criminal defendant has a right to represent himself, provided that the accused "knowingly and intelligently" waives the right to be represented by counsel. 422 U.S. at 835. Such a waiver must be "clear and unequivocal," a requirement this circuit has strictly construed. *Burton v. Collins,* 937 F.2d 131, 133 (5th Cir. 1991). The court will "indulge every reasonable presumption against waiver" of the fundamental constitutional right to the assistance of counsel. *Id.*

As discussed above, in this case, Ybarra clearly and unequivocally waived his Sixth Amendment right to the assistance of counsel. The Fifth Circuit has held that a defendant's statutory right to choose *pro se* or attorney representation is "disjunctive"; a defendant has a right to one or the other, but not a combination of the two. *United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978). Ybarra was constitutionally guaranteed the right to represent himself if he so chose, or to receive competent representation from an attorney, but the availability of standby counsel to provide a combination of the two was not constitutionally required. If Ybarra had no right to standby counsel, it seems unlikely that standby counsel's failure to assist, could be a violation of his Sixth Amendment rights. *United States v. Mikolajczyk*, 137 F.3d 237, 246 (5th Cir. 1998).

Alternatively, the court finds that Ybarra has failed to show that Nash's performance was deficient or that Ybarra suffered any resulting prejudice. Ybarra faulted Nash for refusing to subpoena Officer Cole to testify about his role in breaking Ybarra's radio. Ybarra sought to show that Officer Cole broke Ybarra's radio; that Officer Cole told Sergeant Sepulveda that he had been threatened by Ybarra; and that Sergeant Sepulveda used excessive force against Ybarra based on Officer Cole's false statements. Nash explained that he did not think Ybarra could avail himself of the self-defense argument. Though Officer Cole was the individual who allegedly broke Ybarra's radio, Ybarra threw hot water on Sergeant Sepulveda, a person not involved in breaking Ybarra's radio. Ybarra complained repeatedly at trial of Nash's refusal to subpoena Officer Cole. This was the primary reason Ybarra chose to represent himself. The court assured Ybarra that Officer Cole would be subpoenaed. Officer Cole did testify during the defense's case-in-chief. Given that Ybarra was able to call Officer Cole, Ybarra has not explained how he was harmed by Nash's alleged failure to subpoena Officer Cole.

Ybarra asserts that prior to the incident on January 20, 2005, he saw Officer Cole urinate in a beverage container and fondle his genitalia before assembling food trays that were to be served to inmates on the wing.   Ybarra states that he filed a grievance based on this incident, but never received a response.   Ybarra asserts that Officer Cole retaliated against Ybarra by pulling the coaxial cable and destroying Ybarra's radio on January 20, 2005.   (Docket Entry No. 21, Petitioner's Response, p. 5).   The record shows that Ybarra questioned Officer Cole about this incident, and Officer Cole denied any recollection.   (Reporter's Record, Vol. III, p. 26).

The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.   Ybarra has not shown a basis for the relief he seeks.   28 U.S.C. § 2254(d)(1).

## VII.   The Claim of Failure to Make a *Batson* Challenge

Ybarra complains that the jury empaneled to hear his case was all white.   He maintains that there were members of his own race in the community of Madisonville, Texas.   Ybarra is alleging that the prosecutor used his peremptory strikes to remove venire members who were not white.

"The use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth Amendment." *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000). *Batson v. Kentucky,* 476 U.S. 79 (1986) establishes a three-pronged inquiry to determine whether a peremptory challenge was based on race: First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. *Snyder v. Louisiana*, 552

U.S. 472, 128 S. Ct. 1203 (2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)) (internal quotations omitted).  The party challenging a strike bears the burden of persuasion to show that it was purposefully discriminatory.  A *prima facie* showing that the strike was racially motivated is the first step.  *United States v. Davis*, 393 F.3d 540, 544 (5th Cir. 2004). If the *prima facie* showing is made, the burden shifts to the party making the strike to articulate a race-neutral justification.  *Id.*  The trial court must determine whether the party making the challenge has carried its burden of proving purposeful discrimination.  *Id.*  Under the Equal Protection Clause, a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race.  *Powers v. Ohio*, 499 U.S. 400 (1991).

Nothing in the record supports Ybarra's allegation that particular jurors were improperly struck. The record provides no basis for an inference of purposeful discrimination. Ybarra concedes that he has no proof of purposeful discrimination. Ybarra's conclusory allegation is not supported by the record.

Ybarra is not entitled to federal habeas corpus relief on this claim.

## VIII.  The Claim Based on the Improper Use of Shackles at Trial

Ybarra complains that he was forced to wear shackles during the trial because he refused to be represented by Nash.  He claims the shackles were visible to the jury at all times.  Ybarra claims that Nash asked the judge to have Ybarra placed in shackles so that Nash could represent Ybarra at trial.  The trial judge complied with Nash's request.  Ybarra asserts that the district court violated his due process rights by having him appear in shackles throughout his jury trial.

demonstrated his capability for violence.  Kimbro described an exchange between Ybarra and Nash earlier that morning.  Ybarra refused to sign some papers, and he refused a direct order to sit down. Kimbro asked Ybarra if there was going to be a problem at trial, and Ybarra said he could not guarantee that. (Reporter's Record, Vol. II, p. 16).  Kimbro testified that Ybarra should be in leg restraints and the hand restraints could be removed.  The prosecutor asked Kimbro to take a chair in the jury box to see if the leg irons were visible.  Kimbro stated that if any restraints were used, he was prepared to take steps to make sure the jury did not see or hear them.  He would make sure that Ybarra was in his chair before the jury came into the courtroom.

Although constitutional due process generally militates against the routine use of visible shackles during the guilt phase of a criminal trial, the state trial court took steps to ensure that the jurors would not see Ybarra in shackles in an effort to eliminate any prejudicial effect the restraints might otherwise have had on the jury.  *See Deck v. Missouri*, 544 U.S. 622, 631-32 (2005); *Chavez v. Cockrell*, 310 F.3d 805, 808-09 (5th Cir. 2002).  Because the shackles were not visible to the jury, Ybarra cannot show he was denied his constitutional right to a fair trial and the presumption of innocence.

On collateral review of a state conviction, a federal court will grant habeas relief only when the use of restraints "had a substantial and injurious effect or influence in determining the jury's verdict." *Hatten v. Quarterman,* 570 F.3d 595, 604 (5th Cir. 2009) (citations and internal quotation marks omitted).  Overwhelming evidence of a defendant's guilt may be sufficient to render harmless any error in shackling a defendant.  *Id.* Moreover, a jury's knowledge that a defendant already is a convicted prisoner may be a factor to consider when addressing whether a shackling error is

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629. The Court explained that visible shackling of a criminal defendant during trial "undermines the presumption of innocence and the related fairness of the factfinding process," "can interfere with a defendant's ability to participate in his own defense, say by freely choosing whether to take the witness stand on his own behalf," and "'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" *Id.* at 630-31 (alteration in original) (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). Even before *Deck* was decided by the Supreme Court, the Fifth Circuit held that "[s]hackling is an inherently prejudicial practice, permitted only when justified by an essential state interest specific to each trial." *United States v. Joseph*, 333 F.3d 587, 590-91 (5th Cir. 2003); *see also United States v. Hope*, 102 F.3d 114, 117 (5th Cir. 1996).

A trial court may, however, require a defendant to wear restraints if the trial court deems it necessary to protect the court and the courtroom. *Deck*, 544 U.S. at 632. The trial court must take into account the circumstances of the particular case. *Id.* The Supreme Court recognizes that "[t]here will be cases . . . where these perils of shackling are unavoidable." *Id.* When determining whether a violation occurred, this court considers any "steps to mitigate any prejudicial influence on the jury." *Chavez v. Cockrell,* 310 F.3d 805, 809 (5th Cir. 2002).

Prior to trial, the trial court conducted a hearing to determine the need for shackles. Billy Kimbro testified that he worked for inmate transportation with Texas Department of Criminal Justice. He did not think it would be safe to try Ybarra without restraints because Ybarra already

27

harmless. *See Wilkerson v. Whitley,* 16 F.3d 64, 68 (5th Cir.), *reinstated in relevant part,* 28 F.3d 498, 509 (5th Cir. 1994) (en banc).

It is undisputed that Ybarra was a convicted prisoner on trial for an assault on a public servant committed in prison.  Any error by the state trial court in having Ybarra shackled during trial was harmless.  The jury knew that Ybarra was a prisoner accused of committing a crime in prison. *See Wilkerson,* 16 F.3d at 68.  Additionally, the evidence against Ybarra was overwhelming.  Two correctional officers testified that Ybarra threw scalding water on them while they were trying to transport him to a different cell.  The jury was able to view a videotape of the incident that showed the officers' efforts to remove Ybarra from the cell and Ybarra's throwing the liquid in their dirrection.  In light of the strength of the evidence against Ybarra and the jury's knowledge that Ybarra was already a prisoner, any viewing of Ybarra's leg restraints by the jury would not have substantially influenced the verdict. *See Hatten,* 570 F.3d at 604.

The state trial court's actions in ordering that Ybarra wear leg restraints under his clothing and that all such restraints be hidden from the jury's view were clearly reasonable responses to the risks of a possible violent outburst by Ybarra.  In fact, the state trial judge's ruling appears to be a wholly reasonable attempt to balance legitimate concern over a potential outburst by Ybarra with a genuine concern for ensuring Ybarra a fair trial.  Ybarra offered no rebuttal to the evidence showing that he had refused the orders issued by the transportation officers.  Nor did he rebut testimony that Ybarra could not guarantee that he would control himself at trial.

The Supreme Court has never held that a trial judge must wait until a defendant engages in obstreperous or violent conduct in the courtroom or becomes the victim of such conduct by others before resorting to concealed physical restraints.  On the contrary, the Supreme Court's precedent

focuses on the potentially prejudicial impact of practices that are "conspicuous, or at least noticeable." *See Holbrook v. Flynn*, 475 U.S. at 568. Finally, Ybarra alleged no specific facts showing that he was actually prejudiced by the concealed leg restraints. *See Holbrook v. Flynn*, 475 U.S. at 567 (recognizing that not every practice tending to single out the accused from everyone else in the courtroom must be struck down).

Under such circumstances, the state habeas court's conclusion that Ybarra's complaints about his leg restraints failed to establish a violation of Ybarra's constitutional right to a fair trial was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

Ybarra is not entitled to federal habeas corpus relief on this claim.

## IX.    The Claim Based on an Excessive Use of Force

Ybarra complains that prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by using two canisters of pepper gas to extract Ybarra from his cell. He states that the video tape offered at trial does not show that Sergeant Sepulveda used two canisters of pepper gas. He argues that the videotape was altered by prison guards at the Ferguson Unit.

In light of Ybarra's conviction for aggravated assault of a public servant, the Court must determine whether *Heck* applies to bar Ybarra's claim. In *Heck*, the Supreme Court ruled that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a

> state tribunal authorized to make such determination, or called into
> question by a federal court's issuance of a writ of habeas corpus, 28
> U.S.C. § 2254. A claim for damages bearing that relationship to a
> conviction or sentence that has not been so invalidated is not
> cognizable under § 1983.

512 U.S. at 486-87 (footnote omitted).

Under *Heck*, courts must consider "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 486-87. When success in a civil "action would implicitly question the validity of conviction or duration of sentence, the litigant must first achieve favorable termination of his available state, or federal habeas, opportunities to challenge the underlying conviction or sentence." *Muhammad v. Close*, 540 U.S. 749, 751 (2004).

To determine whether *Heck* bars relief on a particular claim raised by Ybarra, the Court must consider the nature of Ybarra's conviction and the nature of the civil claims asserted. *Arnold v. Town of Slaughter*, No. 03-30941, 2004 WL 1336637, at *2 (5th Cir. June 14, 2004) (citing *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996)), *cert. denied*, --- U.S. ----, 125 S. Ct. 429 (2004).

As noted by the Fifth Circuit, it is "not always clear" how *Heck* applies to claims of excessive force. *See Arnold v. Town of Slaughter*, No. 03-30941, 2004 WL 1336637, at *2 (5th Cir. June 14, 2004), *cert. denied*, --- U.S. ----, 125 S. Ct. 429 (2004). Further, "a plaintiff will not invariably invalidate his conviction" by succeeding on a claim of excessive force. *Id.* (citing *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996)). Nevertheless, where a plaintiff has been convicted of assaulting the arresting officers, success on an excessive force claim will necessarily implicate the validity of the particular conviction and thus invoke *Heck*'s bar to relief. *See, e.g., Hainze v. Richards*, 207 F.3d

795, 798 (5th Cir. 2000) (holding that excessive force claims under § 1983 are "barred as a matter of law if brought by an individual convicted of aggravated assault related to the same events"); *Sappington v. Bartee*, 195 F.3d 234, 235 (5th Cir. 1999) (holding that a claim of excessive force is necessarily inconsistent with a criminal conviction for aggravated assault of a public servant because the conviction necessarily means that the assaulter had no self-defense justification for the assault and holding that a conviction for aggravated assault premised on the infliction of "serious bodily injury" bars an excessive force claim under § 1983 stemming from the events of the aggravated assault because, as a matter of law, the force exerted to protect oneself against an aggravated assault "cannot, under Heck, be deemed excessive"); *Hudson*, 98 F.3d at 873 (holding that *Heck* bars claims of excessive force when the plaintiff has been convicted of "battery of an officer" because self-defense is a justification defense to such conviction under Louisiana law);

This court must consider the specific facts of Ybarra's conviction and the claims of excessive force in order to determine whether *Heck* bars relief.  In Ybarra's case, a jury convicted him of two counts of assault of a public servant.  Because Ybarra had "a defense to prosecution" if his conduct was justified under Chapter 9 of the Texas Penal Code, *see* TEX. PEN. CODE § 9.02, the jury necessarily found no justification for Ybarra's conduct. *See Hudson v.* Hughes, 98 F.3d 868, 873 (5th Cir. 1996) (addressing self-defense justification under Louisiana law).  Section 9.31(c)(1) of the Texas Penal Code provides a justification defense for "[t]he use of force to resist an arrest or search . . . if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search."  By finding Ybarra guilty of aggravated assault of a public servant despite the availability of the justification defense of

§ 9.31(c)(1), the jury necessarily found Ybarra was not justified in his use of force to resist Sergeant Sepulveda on January 20, 2005. *See Sappington v. Bartee*, 195 F.3d 234, 236-37 (5th Cir. 1999).

A finding of excessive force in this civil action would be inconsistent with the jury's finding that Ybarra had no justification to use force against the officers. Such finding would therefore necessarily imply the invalidity of Ybarra's convictions for aggravated assault of a public servant. Consequently, *Heck* bars relief on Ybarra's claims of excessive force.

## X. Conclusion

Respondent's Motion for Summary Judgment, (Docket Entry No. 18), is GRANTED. Ybarra's petition for a writ of habeas corpus is DENIED. This case is DISMISSED. Any remaining pending motions are DENIED as moot.

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c) (1)(A). A district court may deny a certificate of appealability on its own because the district court is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. *See Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). The Supreme Court has stated that the showing necessary for a Certificate of Appealability is a substantial showing of the denial of a constitutional right. *Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir. 2000) (citing *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000)). Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further. *See Clark v. Johnson,* 202 F.3d 760, 763 (5th Cir. 2000). The applicant must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. 484.  This court has denied Ybarra's petition after careful consideration of the merits of his constitutional claims.  This court denies a COA because Ybarra has not made the necessary showing for issuance.

SIGNED at Houston, Texas, on _____DEC 10_____, 2009.


_____
VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE

O:\RAO\VDG\2009\09-0206.d01

34